UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 11-51393 |
| BASS, LTD., | CHAPTER 11 |
| DEBTOR-IN-POSSESSION | JOINT ADMINISTRATION REQUESTED[1] |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (1) AUTHORIZING USE OF CASH COLLATERAL; (2) GRANTING ADEQUATE PROTECTION; (3) SCHEDULING AND APPROVING THE FORM AND METHOD OF NOTICE FOR A FINAL ORDER; AND (4) FOR RELATED RELIEF**

**NOW INTO COURT**, through undersigned counsel, comes the debtors-in-possession, Bass, Ltd. (individually, "Bass Ltd.") and Bass Digital Sign Sales, LLC (individually, "Bass Digital," and together with Bass Ltd., collectively, the "Debtors"), who move for the entry of an order, in substantially the form attached hereto as Exhibit A, (1) authorizing the Debtors to use cash collateral; (2) granting adequate protection; (3) scheduling and approving the form and method of notice of the final hearing on this motion; and (4) for other related relief as necessary. In support, the Debtors represent:

1.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein is 11 U.S.C. §§ 105(a) and 363, and FED. R. BANKR. P. 4001.

2.  On this date (the "Petition Date"), the Debtors filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors intend to continue to

---

[1] Joint administration requested with *In re Bass Digital Sign Sales, LLC*, 11-51396 (Bankr. W.D. La.).

1

operate their businesses and manage their properties as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested or appointed, and no official committee of creditors or equity interest holders has yet been established.

3. By a separate motion, the Debtors have requested joint administration of these chapter 11 cases.

### Bass Ltd.

4. Bass Ltd. is a subchapter "S" corporation, incorporated on December 30, 1991 in the State of Louisiana. Stephen B. Sonnier ("Sonnier") is the president of Bass Ltd.

5. Bass Ltd. is a provider of outdoor advertising, including billboards, bulletins, posters, tri-visions, and highway signs. Bass Ltd.'s main source of revenue is renting billboard space to its customers. Bass also receives revenues from the production and installation of vinyls. Bass Ltd.'s customer base consists primarily of motels, oilfield companies, casinos, restaurants, retail businesses, banks, automobile dealerships, camper dealerships, and truck stops.

6. Bass, Ltd. owns all of its billboard structures. The structures sit on property leased by Bass Ltd. from numerous landowners. Most landowners are paid on a monthly basis, with a few being paid annually. To operate these billboards, it is necessary to pay these landowners, as well as any general liability insurance required, all utilities, any supplies necessary to maintain the billboards (lights, rods, ratchets, *etc*.). It is also necessary to purchase the vinyl substrates for each customer and to have them hung on the billboard structures. This means it is necessary to pay to have these vinyls produced, labor to have them installed, and a crane truck to reach the height of the sign.

## Bass Digital

7. Bass Digital is a limited liability company, organized on June 18, 2007 in the State of Louisiana. Sonnier is a 50% member, the Stephen B. Sonnier Inter Vivos Trust No. 1 is a 30% Member, and Bass Ltd. is a 20% member.

8. Bass Digital's main source of revenue is renting electronic billboard messaging space to customers. Bass Digital also owns two (2) static billboard faces. Its customer base consists primarily motels, oilfield companies, restaurants, retail businesses, casinos, banks, automobile dealerships, camper dealerships, and truck stops.

9. Bass Digital owns all of its billboard structures and electronic messaging displays; however, these structures sit on property leased by Bass Ltd. from the landowners. Most landowners are paid on a monthly basis, with a few being paid annually. To operate these billboards it is necessary to pay these landowners, as well as any general liability insurance and an equipment floater policy (which included wind & hail), all utilities, cellular services utilized to connect to the digital signs, any supplies necessary to maintain the billboards (lights, *etc.*).

10. Prior to the Petition Date, Bass Digital paid Bass Ltd. a monthly management fee of $7,000, which was an accounting entry between Bass, Ltd. and Bass Digital. This fee covered any overhead necessary to run Bass Digital, such as salesmen and clerical work. However, during these chapter 11 cases, Bass Ltd. will not charge Bass Digital a $7,000 monthly management fee.

## Events Leading to Chapter 11

11. The Debtors sought bankruptcy protection for several reasons. The primary reason is its strained relationship with its primary lender, Courtesy Outdoor Finance, LLC ("Courtesy").

12. On or about February 28, 2007, Bass Ltd. executed a promissory note in favor of Courtesy in the original principal amount of Three Million and 00/100 Dollars ($3,000,000.00) ("*Note A*"). Note A was subsequently amended by the First Amendment to Promissory Note dated July 18, 2007, Second Amendment to Promissory Note dated March 10, 2008 (increasing the available principal amount to $3,500,000.00, among other provisions), and Third Amendment to Promissory Note dated April 1, 2009 (increasing the available principal amount to $4,250,000.00, among other provisions).

13. On July 18, 2007, Bass Digital executed a promissory note in favor of Courtesy in the original principal amount of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) ("Note B"). Note B was subsequently amended by the First Amendment to Digital Promissory Note dated March 10, 2008, and Second Amendment to Digital Promissory Note dated April 1, 2009.

14. As a result of the nationwide economic downturn, last year's oil spill, and the ensuing federal drilling moratorium in the Gulf of Mexico, the Debtors experienced a slowdown in advertising revenues. The Debtors attempted to obtain relief from Courtesy by negotiating a reduced interest rate. Courtesy refused. Instead of working with the Debtors, Courtesy embarked on a path to financially cripple the Debtors.

15. During the summer of 2010, Courtesy began sending "lockbox" letters to the Debtors' customers. These letters demanded and instructed the Debtors' customers to forward payments directly to Courtesy. Courtesy's transmission of these letters affected a *de facto* seizure and sequestration of the Debtors' revenue stream, which further hamstrung the Debtors' business operations. Upon information and belief, Courtesy's "lockbox" letters have resulted in

4

1315758-7

11-51393 - #6  File 09/27/11  Enter 09/27/11 16:31:48  Main Document  Pg 4 of 17

more than $130,000 in the Debtors' cash revenue being seized and sequestered by Courtesy even though Courtesy has not obtained a judgment against the Debtors or Sonnier.

16. Further, on September 2, 2010, Courtesy filed suit against the Debtors and Sonnier in the United States District Court for the Western District of Louisiana, Lafayette Division.[2] Courtesy sought a money judgment against the Debtors and Sonnier in an amount equal to the unpaid balance of Note A and Note B, along with interest, additional interest, and attorneys' fees.

17. While the Debtors and Sonnier did not dispute the existence of the Debtors' obligations to Courtesy under Note A and Note B, the Debtors and Sonnier specifically disputed Courtesy's calculation of unpaid principal, interest, additional interest, and other charges. For instance,[3] Courtesy claims that, as of December 31, 2010, the total amount due and unpaid on Note A after credit for all payments received is $4,130,396.93 in principal, $361,726.19 in interest, $95,000 in additional interest, and $47,500 in later fees. Bass Ltd. contests these amounts and the calculations underlying these amounts. First, Bass Ltd. has paid Courtesy additional interest on account of and in conformance with the original version of Note A. However, Bass Ltd. is unable to determine how (or even if) Bass Ltd.' additional interest payments were credited by Courtesy. Thus, Bass Ltd. contests the amount of interest and additional interest claimed by Courtesy in connection with Note A. Second, Courtesy claims that the original version of Note A bore interest at a rate equal to the sum of LIBOR plus 8.75% per annum. This is incorrect. According to the original version of Note A, the original version of

---

[2] *See*, *Courtesy Outdoor Fin., LLC v. Bass, Ltd., et al*, 6:10-cv-01382-TLM-PJH (W.D. La.) (the "<u>Civil Action</u>").

[3] The disputes cited herein are with respect to Note A, and are not exclusive of the Debtors' disputes with Courtesy. In the Civil Action, Bass Digital has challenged Courtesy's similar assertions with respect to Note B.
5

Note A bore interest at "LIBOR + 8.75%, adjusted monthly". Clearly, the interest rate on the original version of Note A was adjusted monthly. Thus, it appears that Courtesy may have incorrectly calculated interest in connection with Note A. Third, the Debtors specifically dispute Courtesy's claims relating to "Gross Rental Revenues." The third amendment to Note A and the second Amendment to Note B entitled Courtesy to an additional $5,000 interest payment in the event "Gross Rental Revenues" exceeded $125,000 for any month. Courtesy appears to claim that the "Gross Rental Revenues" for Debtors regularly exceed $125,000 for any month because Courtesy claims to be entitled to some $95,000 in additional interest. There is one problem with Courtesy's claim – "Gross Rental Revenues" never exceeded $125,000 for any month. Thus, Courtesy's demand for $95,000 in additional interest is in dispute. Fourth, the third amendment to Note A provided that if Bass failed to make payments to Courtesy by or on the tenth of each month, Bass Ltd. would be liable to Courtesy for a late fee of $2,500. Bass Ltd. disputes that it is liable to Courtesy for any such late fees. Courtesy regularly waived the requirement that Bass make payments on or before the tenth of each month.

18. Courtesy also asserts security interests in all of the Debtors' property and as a result the Debtors believe that Courtesy asserts an interest in the cash on hand of the Debtors' and in the cash proceeds from the operations of the Debtors' business. Moreover, in the Civil Action, Courtesy has asserted a blanket lien against all of the Debtors' collateral. However, the Debtors have been unable to verify Courtesy's security interest and make a determination regarding whether or not a lien claim by a third party may exist. In fact, Bass Ltd. believes it possible that certain of its assets are collateral for debt of a separate party and are not encumbered by Courtesy's purported security interest. This motion does not seek to resolve that issue.

19. Thus, Courtesy's refusal to negotiate a reduced interest rate, the effect of the "lockbox" letters, the recent economic downturn, and Courtesy's miscalculations of amounts due under Note A and Note B have all contributed to the Debtors seeking relief under Chapter 11 of the Bankruptcy Code. Admittedly, the Debtors have not made payments upon Notes A and B, and the inability to come to a consensual resolution has hardened the perspectives of each side and made these bankruptcy filings necessary.

20. Courtesy has filed two motions for summary judgment in the Civil Action. In its most recent incarnation filed on August 8, 2011, Courtesy claims that the Debtors owe to Courtesy a combined non-contingent liquidated indebtedness of not less than $6,577,604.41. The Debtors expressly dispute the amount of the indebtedness allegedly owed to Courtesy. This motion does not seek to resolve the amount of the claim of Courtesy.

**Relief Requested**

21. By this motion, the Debtors request: (A) authorization and approval, pursuant to section 363 of the Bankruptcy Code and FED. R. BANKR. P. 4001(c)(2), to use cash which may constitute Cash Collateral (as defined below) on an interim basis in accordance with the proposed interim order submitted herewith (the "Proposed Interim Order") and in accordance with the budget attached hereto as Exhibit B (as may be amended, supplemented, modified or extended from time to time with the consent of each of Courtesy or upon approval by the Court, the "Budgets")[4] (however, with respect to the Budgets, on a cumulative, weekly basis, the Debtors seek authority to use Cash Collateral in an amount equal to up to fifteen percent (15%)

---

[4] The Budget attached hereto is forward looking over a forward looking through an anticipated effective date of a conformed plan (the "***Budget Period***"). The Debtors have made all reasonable and practical efforts to project their budget over the Budget Period. The Debtors submit that the Budget is reflective of income and expenses that will accrue or are likely to accrue over the Budget Period. The Debtors point out, however, that any particular snapshot period might reflect a different cash accumulation and further that any plan that might be proposed may provide for payment terms on a quarterly or some other basis to account for the fluctuations in cash flow that are inherent in the business of the Debtors.

more than a particular corresponding "category" in the Budgets, provided that (a) Cash Collateral is available, and (b) the aggregate amount of the Budgets is not exceeded by fifteen percent (15%)); (B) grant adequate protection liens to Courtesy, **BUT ONLY** to the extent and in the event that it would be ultimately determined that (i) Courtesy possesses a valid, non-avoidable pre-petition lien and (ii) Courtesy is entitled to adequate protection of any such lien, pending a final hearing on this motion (the "<u>Final Hearing</u>"); and (C) schedule the Final Hearing in accordance with FED. R. BANKR. P. 4001(b)(2), and approve notice with respect thereto, all as more fully described in the Proposed Interim Order.

22. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor-in-possession may use cash collateral with court approval and after notice and a hearing. The Debtors seek authority to use cash in bank accounts and cash generated by the Debtors operations (collectively, to the extent such cash constitutes Cash Collateral, the "<u>Cash Collateral</u>"), in which Courtesy asserts a valid and perfected security interest.[5]

23. Pursuant to section 363(e) of the Bankruptcy Code, the Court may condition the use of such cash collateral "as is necessary to provide adequate protection of" the interests of Courtesy in the Cash Collateral.

24. Pursuant to section 361 of the Bankruptcy Code, when a secured party's interest in cash collateral is entitled to adequate protection, such adequate protection may be provided by, among other things, an additional or replacement lien on assets generated post-petition "to the

---

[5] In addition, other parties may assert security interests in the Debtors' cash, the proceeds generated by the operation of the Debtors' businesses, or otherwise have an interest in Debtors' cash in the proceeds from the operating of the Debtors' businesses.

Nothing herein shall be construed as an admission or acknowledgment that Courtesy (or any other creditor) holds a valid and enforceable lien upon the Debtors' assets, including cash collateral. The Debtors reserve any and all rights and defenses of any nature or kind with respect thereto. Moreover, nothing herein provides or shall be construed to provide the priority of any creditor's security interest.

extent that such… use… results in a decrease in value of such entity's interest in the cash collateral."

25. Given that Courtesy asserts liens on all of the Debtors' assets, the Debtors propose to grant Courtesy a replacement lien on post-Petition Date assets, having the same respective priority as its pre-petition liens, to secure any post-petition diminution in value thereof **BUT ONLY** to the extent such interests are entitled to adequate protection against such diminution under the Bankruptcy Code, and only to the extent and in the event that it would be ultimately determined that (i) Courtesy possesses a valid, non-avoidable pre-petition lien and (ii) Courtesy is entitled to adequate protection of any such lien.

26. Further, upon information and belief, Courtesy is receiving payments directly from the Debtors' customers on account of the "lockbox" letters. The Debtors have an immediate need to use this cash, and request, as part of this motion, that Courtesy relinquish its *de facto* seizure and sequestration on these monies, and release the Debtors' customers from the "lockbox" letters so that the Debtors may continue their business operations. The Debtors acknowledge that any funds previously applied by Courtesy toward payment of the indebtedness under Note A and Note B prior to the Petition Date are not subject to the automatic stay, or this motion (though the Debtors reserve all rights regarding such payments), but do assert that any funds being held by Courtesy are held subject to the automatic stay. This motion does not seek return of such funds but all rights are reserved under section 362 and 542 of the Bankruptcy Code.

27. The Debtors have an immediate need to use Cash Collateral for the purpose of meeting necessary expenses incurred in the ordinary course of their businesses, including payroll and the costs associated with its restructuring and these proceedings, while they restructure and

9

1315758-7

11-51393 - #6  File 09/27/11  Enter 09/27/11 16:31:48  Main Document  Pg 9 of 17

reorganize their indebtedness and businesses in a manner that maximizes value and is fair and equitable to all parties in interest. As of the Petition Date, the Debtors possessed some small amount of cash in their bank accounts and possessed leases, contracts, buildings, and accounts to be billed (the "Petition Date Cash Collateral"). The Petition Date Cash Collateral and future receipts from continued operations are sufficient to fund the Debtors' continued operations during the period set forth in the Budget. As suggested by the Budget, the Debtors predict they will have a sufficient cash flow.

28. The Budget provides for the payment of essential ordinary course operating expenses during these chapter 11 reorganizations. A cessation of operations is not in the best interests of any party to these chapter 11 cases, including Courtesy, as the Debtors' failure to operate certain facilities will immediately and irreparably impair the Debtors' extrinsic value. Additionally, the Budgets provide for payment of chapter 11 costs, including the projected fees payable to the office of the United States Trustee[6] and periodic payments to professionals engaged in these chapter 11 cases. As long as Courtesy is adequately protected, the Debtors' use of the Cash Collateral to pay its professionals is allowed. *Cf. In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 695 (Bankr. S.D. Tex. 2009) ("[I]n order for this Court to authorize the use of cash collateral, the Lender must be adequately protected.") (internal citations omitted). *See also*, *In re WBE Co., Inc.*, 2007 WL 4892121, *1 (Bankr. D. Neb. 12/21/07) ("A debtor may use cash collateral to pay professional fees if the secured creditor is adequately protected, without regard to requirements of § 506(c).") (internal citations omitted). In fact, however, the monthly

---

[6] The Debtors estimate that combined cash disbursements will be approximately $252,000 based upon the Budget. This translates into a quarterly fee of $1,950. However, the amount of the quarterly fee payable to the Office of the United States Trustee may vary by quarter depending on the Debtors' actual cash disbursements.

10

amounts shown for professionals will not be paid without order of this court and are set forth as accruals rather than cash payments.

29. As discussed herein, Courtesy is adequately protected; thus, payment of the Debtors' professionals' fees and expenses using the Cash Collateral is proper. As stated in the Budget, the Debtors project confirmation of a plan in short order and the accumulation of cash and assets to provide Courtesy with protection of its lien claims until the effective date of a plan (which is projected to occur in February of 2012).

30. Without use of Cash Collateral on a limited basis as described herein, the Debtors' will not be able to pay its employees and other direct operating expenses. Inability to use Cash Collateral on the basis set forth in the Budgets would likely result in an immediate cessation of the ongoing operations of the Debtors' businesses and would cause irreparable harm to the Debtors' estates. Without the use of Cash Collateral, the Debtors will not be able to, inter alia, purchase vinyl to build billboards, pay electrical companies to maintain digital/electronic signs, and pay the lessors of immovable property upon which the Debtors' outdoor advertising structures sit. Without the use of Cash Collateral to meet these post-petition obligations, the Debtors will be unable to generate sufficient cash flows to protect Courtesy's lien claims and fund these reorganizations. Put simply, the Debtors cannot continue operations that need to be conducted absent use of Cash Collateral. For this reason, this motion is being presented on an interim basis.

31. Exactly what constitutes adequate protection must be decided on a case-by-case basis. *In re Energy Partners, Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009) (citing *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). Adequate protection preserves the status quo for secured creditors. *In re Good*, 428 B.R. 235, 241 -242 (Bankr. E.D. Tex. 2010). Adequate

11

protection exists by virtue of augmentation (or preservation) of the value of a secured creditor's collateral. *See*, *In re Ralar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection"); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716-17 (Bankr. D. Del. 1996) (court found secured creditor was adequately protected given lack of evidence that collateral was diminishing, debtor had operated profitably and was projected to continue operating profitably).

32. As adequate protection for the Debtors' use of Cash Collateral hereunder (collectively, the "Post-Petition Obligations"), Courtesy will be granted, but only to the extent and in the event that it would be ultimately determined that (i) Courtesy possesses a valid, nonavoidable pre-petition lien and (ii) Courtesy is entitled to adequate protection of any such lien, effective immediately and without the necessity of the execution by the Debtors of financing statements, mortgages, security agreements, or otherwise, in accordance with section 361(2) of the Bankruptcy Code, replacement security interests in and liens on (the "Adequate Protection Liens") all post-petition assets of the Debtors and their estate on which Courtesy holds valid and perfected liens as of the Petition Date and all proceeds, rents, and products of all of the foregoing and all distributions thereon (collectively, the "Post-Petition Collateral"), in the same respective priority they held prior to the Petition Date, and subject only to valid, perfected, enforceable and non-avoidable liens and security interests granted by law or by the Debtors to any person or entity that were superior in priority to the prepetition security interests and liens held by Courtesy, and only to the extent that Courtesy's liens are not otherwise subject to avoidance or subordination, which Adequate Protection Liens are granted to secure the amount of any post-petition diminution in the value of Courtesy's interests in the Cash Collateral to the extent such interests are entitled to adequate protection against such diminution under the

12

1315758-7

11-51393 - #6   File 09/27/11   Enter 09/27/11 16:31:48   Main Document   Pg 12 of 17

Bankruptcy Code. Notwithstanding the foregoing or anything herein to the contrary, the Post-Petition Collateral shall not include any claims, causes of action and proceeds thereof arising under sections 510, 544, 545, 546, 547, 548, 549, 550, and 551 of the Bankruptcy Code (collectively, "Avoidance Actions").

33. Further, all Cash Collateral now existing and hereafter acquired will be deposited and maintained by the Debtors in certain bank accounts (the "Cash Collateral Accounts"), pending disbursement in the ordinary course of business of the Debtors consistent with the provisions of the Proposed Interim Order and the Budgets.

34. The Budget includes (a) the Debtors' aggregate projected sources and uses of cash over the Budget period and (b) summaries of the Debtors' operating properties' impact on and contributions to the Debtors' cash budget. The Debtors acknowledge that it may be necessary to amend and recalibrate the Budget as income is earned and expenses are incurred during the course of the Budget Period. Thus, the Debtors may seek to recalibrate the Budget on a quarterly basis or more frequently as circumstances may warrant.[7]

35. The Debtors request that the Debtors and Courtesy be allowed to amend the Budget without further notice to creditors or Order of the Court, provided that a stipulation regarding amendment of the Budget (a "Budget Stipulation") signed by counsel for Debtors and Courtesy is filed in the record of this case together with a copy of the amended Budget, and any amended Budget is served on the Office of the United States Trustee, the twenty (20) largest unsecured creditors, those parties requesting notice, and any other party-in-interest.

36. The Debtors further request that if Courtesy does not consent to any such amended Budget, then Courtesy shall be deemed to consent to an expedited hearing on a motion

---

[7] The Debtors point out that it is possible that future budgets could have reduced revenue and/or expense amounts due to the cyclical nature of the business.

to be filed by Debtors to amend the applicable cash collateral order, upon at least three (3) business days notice of such request and request for hearing. As mentioned, the Debtors request the use of Cash Collateral in an amount equal to up to fifteen percent (15%) more than a particular corresponding "category" in the Budget, measured on a cumulative, monthly basis, provided that (a) Cash Collateral is available, and (b) the aggregate amount of the Budget is not exceeded by fifteen percent (15%). The Debtors assert that all Cash Collateral now existing and hereafter acquired will be deposited and maintained by the Debtors in the estates' bank accounts at Capital One Bank,[8] over which the Debtors have and will maintain sole authority (the "***Cash Collateral Accounts***"), pending disbursement in the ordinary course of business of the Debtors consistent with the provisions of the Proposed Interim Order, the Budget, and any order of this Court concerning professional compensation and reimbursement.

37. The Debtors will provide Courtesy with a monthly cash flow report showing actual cash receipts and disbursements and providing a comparison of actual cash receipts and disbursements to the projections contained within the Budget.

38. FED. R. BANKR. P. 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

39. Pursuant to FED. R. BANKR. P. 4001(b), the Debtors request that this Court conduct a preliminary expedited hearing as soon as practicable (the "Preliminary Hearing") to

---

[8] As shown in the Debtors' cash management motion, the Debtors' maintain accounts with several banking institutions, including Capital One Bank. The Debtors two (2) accounts with Capital One Bank are used to funds all payables and payroll.

enter the Proposed Interim Order authorizing the Debtors to use Cash Collateral in an aggregate amount not to exceed the amounts set forth in the Budgets (other than as described herein) attached to the Proposed Interim Order pending the Final Hearing.

40. The ability of the Debtors to finance, through the use of Cash Collateral, their ongoing operations as they restructure their indebtedness and businesses for the benefit of all creditor constituencies is in the best interests of the Debtors, all of their creditors and their estates. The relief requested herein is necessary in order to avoid immediate and irreparable harm and prejudice to the Debtors' estates and to all parties-in-interest in these chapter 11 cases. The Debtors have an urgent and immediate need to use Cash Collateral to continue their business operations while they pursue a restructuring or alternate exit to these chapter 11 cases. For the non-exclusive reasons set forth herein, the Debtors' businesses will be immediately and irreparably harmed without authorization from this Court to use Cash Collateral, as requested, on an interim basis pending the Final Hearing, and the Debtors' restructuring efforts will be over.

41. The interests of Courtesy in the Cash Collateral will be adequately protected pursuant to the Proposed Interim Order.

42. Pending the Final Hearing, this motion should be granted on an interim basis, on the terms set forth in the Proposed Interim Order, in order to maximize the value of the estate and to prevent irreparable harm to the Debtors prior to the Final Hearing.

43. Pursuant to FED. R. BANKR. P. 4001(c)(2), the Debtors request that this Court set a date for the Final Hearing and approve the provisions for notice of such Final Hearing that are set forth in the Proposed Interim Order.

44. The Debtors request that they be authorized to serve a copy of a signed Interim Order, which fixes the time and date for filing objections, if any, by first-class United States Mail

15

upon Courtesy, all other secured creditors of record, the Office of the United States Trustee, the Debtors' thirty (30) largest creditors on a consolidated basis, and any party having filed a request to receive service in this case. The Debtors request that this Court consider such notice of the Final Hearing to be sufficient notice under FED. R. BANKR. P. 4001.

45. Notice of this motion has been given to: (i) the Office of the United States Trustee; (ii) Courtesy, through its respective counsel, David Rubin of Kantrow, Spaht, Weaver & Blitzer, 445 North Blvd., Suite 300, Baton Rouge, LA 70802-5747; (iii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iv) all parties who request notice pursuant to FED. R. BANKR. P. 2002; (v) the Internal Revenue Service; and (vii) all parties entitled to notice under FED. R. BANKR. P. 2002(j). In light of the nature of the relief requested, the Debtors submit that no further notice is required.

**WHEREFORE**, the Debtors request that this Court (a) conduct an emergency hearing on this motion; (b) enter the Proposed Interim Order substantially in the form submitted herewith; (c) schedule a Final Hearing on the relief requested herein; and (d) grant such further relief as may be equitable and just.

**GORDON, ARATA, MCCOLLAM, DUPLANTIS & EAGAN, LLC**

By: **/s/ Louis M. Phillips**
Louis M. Phillips (La. Bar No. 10505)
Peter A. Kopfinger (La. Bar No. 20904)
Ryan J. Richmond (La. Bar No. 30688)
Elizabeth A. Spurgeon (La. Bar No. 33455)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: lphillips@gordonarata.com
Email: pkopfinger@gordonarata.com
Email: rrichmond@gordonarata.com

Email: espurgeon@gordonarata.com

*Proposed Attorneys Bass Ltd. and
Bass Digital Sign Sales, LLC*